ARCTIC CONTRACTORS, INC., et al., Appellants,

v.

STATE of Alaska, Appellee.

STATE of Alaska, Cross-Appellant,

v.

ARCTIC CONTRACTORS, INC., et al., Cross-Appellees.

Nos. 2595, 2657.

Supreme Court of Alaska.

May 6, 1977.

James A. Parrish, Fairbanks, for appellant and cross-appellee.

Avrum M. Gross, Atty. Gen., and Robert M. Johnson, Asst. Atty. Gen., Juneau, for appellee and cross-appellant.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

## OPINION

ERWIN, Justice.

This appeal brings before us a complex dispute which arose out of a 1962 highway construction project outside Fairbanks. The parties are the State of Alaska and the now-defunct Arctic Contractors, the original prime contractor on the project. At the heart of the dispute are the State's claim that the project was seriously delayed due to Arctic's mismanagement and financial instability and Arctic's conflicting claim that the State's unreasonable responses to certain problems which arose on the project contributed to the delay and in fact caused Arctic's financial instability

In the Spring of 1962, appellant/cross-appellee Arctic Contractors submitted a bid on a contract for construction of the Farmers Loop Road outside of Fairbanks. As required by the State's invitation to bid, Arctic Contractors submitted a bid bond prepared by James Kirwan as agent for United Benefit Fire Insurance Company. The bond was accepted and approved by the State of Alaska.

On June 4, 1962, the State of Alaska, appellee/cross-appellant herein, through its Department of Highways, entered into a contract with Arctic for construction of the Farmers Loop Road. The contract called for construction of an 8.9-mile highway within 170 working days. Other specific conditions of the contract were adopted by reference to the "Plans and Specifications," a collection of documents which includes the original contract bids, questionnaires, general and special provisions for the Farmers Loop project, addenda, and related materials. The contract also incorporated the laws of the State of Alaska and the rules and regulations of the administering Federal highway agency. The Plans and Specifications contained provisions governing termination for default, damages for delay, time extensions, dispute resolution by the Contract Claims Review Board, payments to contractors, materials and workmanship, and inspection.

At the time of contracting Arctic was duly incorporated and authorized to do business in the State of Alaska. Prior to commencement of work, Arctic provided assurances that it was financially capable of satisfactorily completing the project and that it had obtained through United Benefit Fire Insurance Co. "bonds in such sums as may be required for the faithful performance on the contract." As required by the contract, Arctic Contractors provided a payment bond and a performance bond, each in the amount of $656,210.50. These bonds, like the bid bond, were purchased from James Kirwan. At the time, Kirwan was an authorized bail bond agent of United Benefit Fire Insurance Company and was in possession of United Benefit's corporate seal and attorney-in-fact stamp, which he affixed to the bonds. While no limitations pertaining to bail bonds appeared on either the seal or the stamp, State of Alaska records showed that James Kirwan was not authorized by United Benefit to sell payment and performance bonds and was not licensed to sell contract bonds.

On June 13, 1962, the State of Alaska accepted and approved the bonds submitted by Arctic. Further, Arctic was instructed to proceed on the project. Arctic Contractors was not aware of any impropriety in the bonds.

Arctic Contractors began work on the contract on June 18, 1962. Substantial capital investment was committed to the Farmers Loop project.

One of the major provisions of the contract required Arctic Contractors to procure and place over four hundred thousand yards of borrow material for the road bed. One of the borrow sources Arctic intended to use was the Thorgaard Pit, located near the center of the project.

The project's first delay occurred when the State Highway Department disapproved road materials being extracted ("borrowed") from the Thorgaard borrow pit. As noted in the amended contract, the

State had previously approved the Thorgaard Pit as a potential source.

While the borrow material in the Thorgaard Pit was within contract specifications for use on the project, approval was required as the extracted material was offered for placement on the road. Arctic had been made aware of this requirement at a pre-construction conference held on June 12, 1962.

During that pre-construction conference, Arctic Contractors had been informed by the State's District Engineer and District Construction Engineer that the State would determine whether the material from the borrow pit was within the contract specifications and whether the contractor could use material from a particular pit on the road. Nevertheless, Arctic waited until after work on the project had begun to have a test run on a representative sample of material from the Thorgaard Pit. The tests showed that acceptable as well as unacceptable material was available in the Thorgaard Pit. However, Arctic did not return to the Thorgaard Pit to extract the acceptable material, but instead went to more distant sources. Arctic left some 160,000 cubic feet of acceptable material at the Thorgaard Pit.

In the middle of August, 1962, the Thorgaard Pit was again tested and approved for extraction of borrow material. Hauling began from the Thorgaard Pit on August 24, 1962. The project had been delayed 32 days between June 27, 1962, and August 24, 1962.

Work on the project did proceed during the 1962 construction season, although behind schedule. The State did not take steps to terminate Arctic Contractors' right to proceed during that year.

In August, 1962, the State of Alaska received notice from United Benefit Fire Insurance Company that the validity of the Arctic payment and performance bonds was to be denied. This notice came when the State notified the bonding company that Arctic had fallen behind in its construction schedule. After the defect in the bonds was discovered, the State made Progress Payment # 2 in the amount of $68,807.53 and Progress Payment # 3 in the amount of $64,548.73.

The defect in Arctic's contractually-required bonding affected Arctic's financial standing in two ways. First, additional bonding or surety had to be acquired. Second, the defect caused the State to withhold Progress Payment # 4 in order to compel Arctic to acquire bonding.

In November, 1962, Progress Payment # 4 (in the amount of $128,000) was due and owing to Arctic Contractors for work completed. By November, 1962, Arctic's financing was precarious. On the due date for Progress Payment # 4, Arctic Contractors had only enough money to pay employees and subcontractors for the work they had actually done. However, Arctic Contractors agreed with the Teamsters working the job that they could keep working into November if they would hold their wage claims until Arctic Contractors received Progress Payment # 4. Work was to continue on the expectation that wages would be paid when Progress Payment # 4 arrived.

Without prior notice to Arctic, the State withheld Progress Payment # 4 in order to force Arctic to obtain new payment and performance bonds. Arctic Contractors did not receive notice of this withholding until November 13, 1962.

The project was shut down for the winter on November 7, 1962. The State made no payments to Arctic or to any employees of either Arctic or its subcontractors. In mid-December, 1962, Carl Pederson, one of the principal stockholders of Arctic, obtained a $23,000 mortgage to pay wages owed to men working on the project. During that same winter, Carl Pederson attempted to obtain new bonding through commercial sources. He was unable to do so because the project at that time was behind schedule and Progress Payment # 4 was still being withheld. Only after Arctic shareholders secured a release of part of Progress Payment # 4 through personal guarantees did sufficient money arrive for

payment of the aggrieved employees' basic wage.

Arctic's failure to pay standby wages for the late wage payments haunted the project in 1963 and 1964. At the beginning of the 1963 construction season, the Teamsters working the project reiterated their claim for standby wages. They told Arctic that they could not waive their claims to standby pay because they would be fined by the union if they attempted to do so. Nevertheless, the claimants did not close down the project in 1963. By the end of the 1963 season Arctic had finished about 80% of the project.

Going into the third season of construction, 1964, Arctic was well over the 170-day time limit for scheduled completion. Indeed, at the end of the first season, Arctic had been 32 days behind schedule. The 170-day limit had been scheduled to end in mid-season, 1963. Nevertheless, Arctic progressed substantially in 1963 and probably planned to finish work in 1964.

On June 11, 1964, Arctic resumed work on the Farmers Loop project. During the early part of the 1964 construction season a dispute arose between the Teamsters Union and Arctic Contractors over the late payment of wages in 1962, which had been caused by the State's withholding of Progress Payment # 4. On June 23, 1964, a work stoppage occurred when the Teamsters Union withdrew its work force pending payment of $1,000 to $1,500 it claimed was due to two of its members. The work stoppage halted all progress on the project. On August 6, 1964, when Arctic was 93 working days over the 170-day contract limit, the State terminated the Farmers Loop contract.

Following notice of termination, Arctic exercised its contractual right of appeal to the Contract Claims Review Board. Arctic based its appeal solely on the work stoppage allegedly caused by failure of the State to pay Progress Payment # 4. An adversarial, evidentiary hearing was held on January 14, 1965. Both Arctic and the State presented witnesses. Counsel for Arctic asserted that Arctic's case was pri-

marily that work had been stopped by action of the Teamsters Union. Arctic claimed that the nonpayment of standby wages, which produced the work stoppage, had been caused by delay in the arrival of Progress Payment # 4. The State defended the progress-payment delay on the basis of the defective bonds. However, at no time did either party raise as an issue any failure of highway inspectors to approve borrow material.

On March 9, 1965, the Board unanimously approved the right of the State to terminate Arctic's contract on grounds related solely to Arctic's failure to timely pay the Teamsters. The Board found that the work stoppage was the result of disagreement concerning standby pay. Arctic did not affirmatively appeal the Board's decision or seek reconsideration.

On March 11, 1965, the State commenced a civil action to recover damages in excess of $550,000 allegedly caused by Arctic's failure to prosecute the work. Arctic answered the complaint and filed counterclaims against the State for $841,000. The counterclaims raised issues not presented before the Contract Claims Review Board, such as (1) allegations of obstruction of the contract by the State in failing to approve a pit for borrow material, (2) damages resulting from the alleged obstruction, and (3) damages for the State's allegedly unauthorized requirement that Arctic post an additional performance bond. Arctic further argued that the State should be estopped from relying on the findings of the Review Board.

On July 13, 1965, Arctic attempted to preserve its alleged right to finish the project by seeking to enjoin enforcement of the State's termination order. Meanwhile the State had moved to dismiss Arctic's counterclaims on the ground that Arctic had not timely paid its corporate license fees. Arctic's motion for injunctive relief was denied on July 20, 1965; the State's motion to dismiss was taken under advisement and subsequently denied. After denial of the State's motion to dismiss Arctic's counterclaims, the State answered those

counterclaims and raised affirmative defenses to them. The State argued that Arctic had not properly exhausted its administrative remedies on those claims not raised at the Review Board hearing.

Following the State's answer to Arctic's counterclaims, the suit slowed to a series of motions to produce, continuances, and actions between United Benefit and Arctic. On November 27, 1971, the State moved to dismiss Arctic's counterclaims on the ground that Arctic had failed to pay its annual corporate taxes and to file annual reports since 1966. Arctic had, in fact, dissolved on November 15, 1968.

On March 20, 1973, the State filed four motions: (1) for summary judgment on Arctic's counterclaims for lack of provable damages; (2) for summary judgment on Arctic's counterclaims for failure to pay annual corporate taxes and to file annual reports; (3) for partial summary judgment on three of Arctic's counterclaims for. Arctic's failure to maintain its corporate capacity; (4) for judgment on the pleadings on Arctic's malicious-prosecution counterclaim. The State also argued that Arctic was not entitled to *de novo* review of the Review Board's findings and could not raise issues as counterclaims which were not raised before the Board.

The Superior Court denied all of the State's motions. The State responded by renewing its motion to dismiss Arctic's counterclaims for lack of corporate capacity. The court denied the first renewed motion and did not rule on the second.

An 11-day trial by court was had in September, 1974, before Judge Warren W. Taylor. The court asked counsel for the State and for Arctic to submit proposed findings of fact and conclusions to be referenced to the transcript. The parties submitted the requested proposals in March, 1975.

On June 30, 1975, the court below entered its memorandum decision and order. In pertinent part the decision found:

(1) that Arctic had an "absolute responsibility" to provide payment and performance bonds as a condition of its contract;

(2) that the State had no legal duty to investigate the authority of the bonding company agent;

(3) that the State's duty to pay Progress Payment # 4 was suspended from the time the State learned that United Benefit disclaimed liability on the bonds until the time valid bonding was provided;

(4) that the State had been negligent in conducting tests of the Thorgaard Pit, and that that negligence contributed to the 32-day delay in 1962 and also caused Arctic to incur additional expenses;

(5) that the State's decision to terminate the contract was consistent with the terms of the contract and that the work stoppage was not beyond Arctic's control;

(6) that "basic principals [sic] of equity and justice" required denial of any contract damages, liquidated or otherwise, to the State because of its negligence;

(7) that the State was not guilty of malicious prosecution in bringing the suit.

Arctic appeals portions of the trial court's decision to this court. The State cross-appeals, specifying as error the decision to grant a *de novo* hearing and the findings against the State.

Both appellant and appellee approach this appeal with the tenacity and verbosity necessary to guarantee a second decade of litigation in this case. In response we can do little more than recognize their arguments and dispose of them as succinctly as possible.

1. Could the State require Arctic to obtain new bonds?

Section 1(a), Ch. 49 SLA 1953,[1] which was in effect at the time the contract herein was signed, provided:

Section 1. *Bonds of Contractors for Public Buildings or Works.*

1. Section 1(a), Ch. 49 SLA 1953 is presently codified with minor amendments as AS 36.25.-010(a).

(a) Before any contract, exceeding $2,000.00 in amount, for the construction, alteration, or repair of any public building or public work of the Territory of Alaska is awarded to any person, such person shall furnish to the Territory of Alaska the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as "contractor":

(1) A performance bond with a corporate surety qualified to do business within the Territory of Alaska . . ..

(2) A payment bond with a corporate surety qualified to do business within the Territory of Alaska . . ..

Construing this statute, the trial court held:

. . . that Arctic Contractors had the absolute responsibility to provide valid performance and payment bonds. Additionally, the Court finds that the State had no legal duty to investigate the authority of the purported agent who wrote the bonds, although, as a practical matter, it seems unwise for the State not to do so. The duty of Arctic Contractors to provide performance and payment bonds was a *condition* of its contract. Thus from the time the State learned that United Benefit had disavowed the validity of the bonds the State's duty to pay progress payment number four was suspended until Arctic Contractors provided valid performance and payment bonds.[2]

The first issue is whether the State could properly require Arctic to furnish new payment and performance bonds as replacements for the original bonds when defects in the originals were discovered after the originals had been accepted by the State and Arctic had commenced work. The result turns on which party had the duty to see that the bonds had a good and sufficient surety. Arctic argues that the State must investigate the validity of the bonds because the State is potentially liable to materialmen if it fails to exact the bonding required by statute. Arctic asserts that the State's duty to assure compliance with the bonding statute necessarily includes the duty to determine whether the bonds offered have been issued by an authorized agent of a bonding company licensed to issue bonds of the type required.

The State denies that it had the obligation to assure the validity of the bonds. It argues that such a duty would put too heavy of an investigative burden on the State because it contracts with so many contractors. Moreover, it is argued, the authority of the agent to issue the bonds was properly a subject of inquiry for Arctic. Under agency law Arctic had the obligation to discover the scope of the agent's authority to issue bonds. Having dealt with the agent, Arctic acted at its own peril. Thus, given the vital purpose served by the bonds, Arctic should be required to furnish valid bonds.

We, like the parties, have found no cases directly on point on the issue of which party had the duty to assure the validity of the bond.[3] However, turning to cases concerning the liability of a public body or public officials to materialmen for letting a public contract without obtaining performance and payment bonds as required by law, it appears that the public body should determine the sufficiency of the bonds. These cases, collected in Annot., 64 ALR 678 (1929), indicate that while the contractor has a duty to execute the bonds, it is the obligation of the public body to approve and accept the bonds.

Upon awarding a public construction contract, the state or a political subdivision of the state shall

. . . . .

(2) verify that the bonding requirements of ch. 25 of this title have been met and that the requirements of AS 08.18 have been met.

2. Memorandum Decision and Order of June 30, 1975 (emphasis added).

3. For cases arising after 1972, there is no doubt about who has the duty to check the validity of public construction contract bonds. In 1972 AS 36.05.035 was enacted, placing the burden of verifying such bonds on the State or its political subdivision. AS 36.05.035 provides in pertinent part:

In *I. W. Phillips & Co. v. Board of Public Instruction,* 98 Fla. 1, 122 So. 793, 794 (1929), the Court stated:

> In the second place, the act under consideration . . . requires the contractor, and not the state or state agency contracted with, to make the bond. In other words, while it is the duty of the board of public instruction to approve and accept the required bond, the initiative is on the contractor to furnish it, no duty is imposed on the board of public instruction to require a bond . . . . .

Similarly, in *Joseph Nelson Supply Co. v. Leary,* 49 Utah 493, 164 P. 1047, 1051 (1917), the court stated:

> Indeed, the statute does not in express terms impose the duty either upon the school district or upon the trustees to exact the bond. What is said is that any person entering into a contract "with the state, any state institution, * * * or school district * * * shall be required before commencing such work to execute a penal bond * * * that such contractor or contractors shall promptly make payment to all persons supplying labor and material used in the prosecution of the work provided for in said contract." No special duty is thus imposed on any one save the person entering into the contract. He shall be required to execute a bond, no one else.

The Utah Supreme Court reaffirmed this view in *New York Blower Co. v. Carbon County High School,* 50 Utah 342, 167 P. 670, 671 (1917):

> To say the least, the duty is not cast upon either the defendants or the high school in express terms to exact such a bond. It is quite clear from the statute, however, that it was intended that the contractor should execute such a bond.

In *Vincent v. Ellis,* 116 Iowa 609, 88 N.W. 836 (1902), the court discussed a county auditor's duty in awarding a public contract. By statute in Iowa, the auditor must let a contract to the lowest bidder so long as that bidder is able to execute a bond with sufficient securities to secure performance of the contract.

The auditor was confronted with two parties presenting bids, and both claiming to be entitled to an award of the entire work. He had in the first place to examine the form and substance of the so-called bids, to determine whether they were entitled to any consideration whatever. It devolved upon him to interpret the language in which the bids were couched, and to compare the items in one with the corresponding items in the other. *It was for him to pass upon the adequacy of the bond which the statute required of the successful bidder, and pass upon the qualification of the sureties.* All these things are to be settled before a contract can be made, and they call for the exercise of judgment and discretion to such a degree that, in our opinion, the demand for a writ of mandamus cannot be sustained.[4]

In *Huebner v. Nims,* 132 Mich. 657, 94 N.W. 180 (1903), the plaintiff, a materialman, brought an action against the five trustees of a school district to recover the balance due him from a contractor on a contract let by the trustees. The defendants' liability was predicated on their failure to take bonds with adequate sureties as required by law. With regard to the issue of the sufficiency of the sureties, the court noted:

> It is for the board to determine the amount for which the bond shall be given, and the sufficiency of the sureties.[5]

*Phillips, Leary* and *New York Blower* emphasize that the contractor, not the public body, has the duty to execute a bond. However, *Huebner* and *Vincent* indicate that once a bond is furnished by the contractor, the public body must determine the sufficiency of the bond. This process is clearly anticipated by the statutes involved in these cases. The decision to approve and accept a bond necessarily entails an inquiry into whether the bond is sufficient to cover the performance of the contract.

---

4. 88 N.W. at 838 (emphasis added).

5. 94 N.W. at 181.

Statutes in this area often explicitly require the contractor to furnish bonds which are satisfactory to the contracting officer. The Miller Act[6] requires a contractor for construction on any federal public building or public work to supply:

> (1) A performance bond with a surety or securities satisfactory to the officer awarding such contract . . .
>
> (2) A payment bond with a surety or sureties satisfactory to such officer. . . .[7]

The Capehart Housing Act requires contracts for construction of housing for military personnel to

> provide for the furnishing by the contractor of a performance bond and a payment bond with a surety or sureties satisfactory to the Secretary of Defense, or his designee, and the furnishing of such bonds shall be deemed a sufficient compliance with the provisions of section 270a of Title 40, and no additional bonds shall be required under such section.[8]

The contracting officer does not play a passive role under such statutory schemes. In *Marquette Gravel & Construction Co. v. Bengtson,* 127 Kan. 492, 274 P. 253, 255 (1929), the court, in referring to a statutory requirement that the public body approve bid and performance bonds, stated:

6. 40 USCA §§ 270a–270d.

7. 40 USCA § 270a(a).

8. 42 USCA § 1594(a).

9. We have already made it clear that materialmen do not have a duty to determine the validity of payment bonds. In *State v. Neal and Sons, Inc.,* 489 P.2d 1016, 1019 (Alaska 1971), this court held that laborers or materialmen should not have to inquire into the validity of the prime contractor's bonds.

> A person furnishing labor or materials on a state public works project, however, does not deal directly with the surety company or its purported agent. In many cases he does not even deal directly with the prime contractor who obtained the bond. He is in a relatively poor position to inquire into whether an agent with whom the prime contractor dealt had authority to bind the insurance company appearing as surety on the bond.

We also noted:

> As a general rule, the party who seeks to bind a principal with acts of a purported

The question of sufficiency of sureties calls for judgment of the approving officers just as does the question of responsibility of the bidder where the board is directed to select the lowest responsible bidder, and the action of the board in this respect should not be questioned unless it is arbitrary, oppressive, or fraudulent . . . . .

Similarly, in *Owen v. Hill,* 67 Mich. 43, 34 N.W. 649, 652 (1887), the court stated:

> The mere act of requiring a bond is a ministerial act involving no discretion, and consequently no judicial functions. In addition to requiring the bond the law requires that they shall first fix the amount in which the bond shall be given, and second they shall pass upon the sufficiency of the sureties.

Statutes such as the Miller and Capehart acts put the burden on the contracting officer to determine the vitality of the surety. Although absent from AS 36.25.010(a)(1), that burden can be read into the language "the contractor shall furnish to the state . . . a performance bond with a corporate surety qualified to do business in the state. . . ."

■ We hold that the burden was on the State to verify the bonds.[9] Nevertheless,

agent bears the burden of proving the fact of agency. Further, . . . a person who deals with another, knowing that the other is acting as an agent, and who fails to inquire into the extent of the delegated authority, may be held to deal at his peril. . . . (Footnotes omitted)

The State argues that our opinion in *Neal and Sons* indicates that the duty to assure the validity of a bond should rest with the person who deals directly with the purported agent of the surety. That person is in the best position to inquire into the scope of the agent's authority to bind the surety. The State contends that as between Arctic and the State, Arctic was in the better position to inquire into the validity of the bonds executed by Kirwan since it had dealt directly with him.

The *Neal and Sons* case dealt with the issue of who, as between the bonding company and materialmen, had the burden of proof as to the validity of a payment bond. We held in that case that the bonding company had that burden of proof because it had better access to evidence on the issue and because the material-

we hold that Arctic had a continuing obligation to furnish the required bonds even though it was the State's duty to investigate their validity.[10] This holding rests on the public policy behind requiring bonds on public contracts.

Arctic argues that when the State permitted work to proceed after discovering the defect in the bonds, it waived its right to require or was estopped from requiring the appellant to obtain new bonds. In support of this contention, appellant quotes Professor Corbin:

> Often, it is a condition of the owner's duty to permit the beginning of work, or to make a payment, that the builder should procure and deliver a surety bond; such a condition is eliminated by a voluntary statement or by merely permitting work to proceed.[11]

Arctic also draws an analogy to the provisions of the Uniform Commercial Code which cover remedies available to the recipient of nonconforming goods. The appellant points out that under the UCC when a buyer accepts goods which are defective, a claim must be brought within a reasonable time or it will be barred. Arctic argues that more than a reasonable time passed between the time the bonds were accepted and the time they were found to be defective. Therefore, the State had no right to require new bonds.

In response to this, the State contends that as soon as it became aware of the invalidity of the bonds, it notified Arctic that compliance with the contract's bonding conditions was required. The State argues that rather than terminating the contract, the reasonable course of action was to allow the appellant additional time for securing bonding while continuing the performance of the contract. We agree.

■ This court has recognized that in a commercial context waiver requires the intentional relinquishment of a known right.[12] The defense of waiver turns upon an examination of a party's intent as expressed by words or conduct.[13] The defense of estoppel "arises where one party makes by its words or actions a false representation of fact, and the other party reasonably relies on the misrepresentation and is prejudiced thereby." [14]

■ The crucial period of time relevant to the waiver and estoppel issues is from mid-August, 1962, to November, 1962. In August the State discovered the defect in the bonds, yet work continued through November when the project was closed down for the winter. When work resumed the following spring, Arctic had acquired adequate bonding.

By mid-August, 1962, the project was already nearly 32 days behind schedule. It was this delay which prompted the State to give notice to United Benefit. Shortly thereafter United Benefit informed Arctic and the State that it disclaimed the bonds because Kirwan was not authorized to act as their agent for such bonds. A check of state records confirm this.

On September 10, 1962, the State sent Arctic a letter which stated:

> I am sure that you can appreciate the fact that the State cannot have an unbonded contractor working on a Federal-aid Highway Project, especially one of this size.

men had not themselves dealt with the purported agent of the company. Although the rationale underlying *Neal and Sons* arguably supports the State's contention, we find the line of authority discussed in the text to be more persuasive in this context.

10. Arctic's duty is similar to the duty an architect has to provide continuing service in connection with public works. *School Dist. No. 1 of Pima Co. v. Hastings,* 106 Ariz. 175, 472 P.2d 44, 47 (1970).

11. 3A Corbin, Contracts § 756, at 504 (1960) (footnote omitted).

12. *National Bank of Alaska v. J.B.L. & K. of Alaska, Inc.,* 546 P.2d 579, 587 (Alaska 1976), citing *Williams v. Stroh Plumbing and Electric,* 250 Iowa 599, 94 N.W.2d 750 (1959).

13. *Allied Steel Constr. Co. v. Employers Casualty Co.,* 422 F.2d 1369, 1371 (10th Cir. 1970).

14. *Id.*

In view of this, you must take immediate action to dispel the uncertainty about these bonds.

The letter also advised the appellant to secure new bonding. When no bonding was furnished, the State Attorney General sent a letter on October 3, 1962, to the appellant warning that:

. . . [T]he State will be forced to terminate your right to proceed under this contract unless you obtain new surety bonds within the next few days.

Once again, no bonds were furnished. Consequently, the State withheld Progress Payment #4 in November to induce the appellant to secure bonding.

It is certainly reasonable to conclude from the State's conduct that it intended for new bonds to be furnished. The State's conduct did not indicate an intention to give up the right to rely on the bonding condition of the contract.[15] Therefore, the State retained its right to require Arctic to comply with the contract's bonding provision.

2. Could the State properly withhold Progress Payment #4 in order to force Arctic to obtain new bonds?

The appellant argues that progress payments must be made according to the terms of the contract. Provisions 7a and 7b of the Farmers Loop contract provided:

(a) Unless otherwise provided in the specifications, partial payments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable, or at more frequent intervals as determined by the Contracting Officer, on estimates made and approved by the Contracting Officer. In preparing estimates the value of materials delivered to and stockpiled in the vicinity of construction may be taken into consideration.

(b) In making such partial payments there shall be retained 10 percent on the estimated amount until final completion and acceptance of all work covered by the contract: Provided, however, That the Contracting Officer, at any time after 50 percent of the work has been completed, if he finds that satisfactory progress is being made, may make any of the remaining partial payments in full: And provided further, That on completion and acceptance of each separate building, public work, or other division of the contract, on which the price is stated separately in the contract, payment may be made in full, including retained percentage thereon, less authorized deductions.

Under these provisions, payments are tied directly to work performed. Nothing in these provisions explicitly authorizes the withholding of payments for the purpose of exacting new bonds.

Appellee argues that the contract required the appellant to provide valid bonding and that section 7c authorized withholding of progress payments as a means of enforcing the terms of the contract. Section 7c provides:

(c) All material and work covered by partial payments made shall thereupon become the sole property of the State, but *this provision shall not be construed* as relieving the Contractor from the sole responsibility for all materials and work

---

**15.** The cases which appellant advances in support of its waiver and estoppel arguments can all be distinguished factually from this case. In *Gray v. Met Contracting Corp.*, 4 A.D.2d 495, 167 N.Y.S.2d 498 (1957), the plaintiff was estopped from urging default by the defendant on a bond requirement in a contract since it had agreed to procure the performance bond which the defendant was otherwise obligated to obtain. In *Shallenberger v. Standard Sanitary Mfg. Co.*, 223 Pa. 220, 72 A. 500 (1909), the owner consented to the contractor's delay in executing the bonds.

In *Lesser v. William Holliday Card Associates, Inc.*, 349 F.2d 490 (8th Cir. 1965), and *Hevenor v. Union Ry. Co. of N.Y.C.*, 204 App. Div. 535, 198 N.Y.S. 409 (1923), Lesser and Union made absolutely no attempt to secure from the contractors the required bonding. From this conduct the courts in those cases concluded that the contractors had waived the bond requirements.

In Baltimore Contractors, Inc., 74–1 BCA ¶ 10414 (1973), the government inspected and approved the coloring of concrete after the first batch had been poured and had dried. Thus, it was estopped from asserting that the concrete lacked integral color after 80% of the concrete had been poured.

upon which payments have been made or the restoration of any damaged work, or *as the waiver of the right of the State to require the fulfillment of all of the terms of the contract.* (Emphasis added)

■ Since Arctic had a continuing duty to provide adequate bonding and since the elements of waiver and estoppel are absent in this case, we conclude that in order to compel adherence to the contract's bonding provisions, the State, upon furnishing notice of its intent to do so, could properly have withheld payments for work and material furnished after notice was given. We find that the provisions in the contract which cover progress payments are not severable from the whole. Rather, there is one contract calling for the completion of the entire project for one price, payable in installments as the work progressed, but subject to the condition that failure to complete the project might require return of some or all of the installments paid.[16]

In *Mittry v. United States,* 73 Ct.Cl. 341 (1931), the Court of Claims was presented with a payment provision nearly identical to provisions 7a, b, and c of the contract in this appeal. Article XXIII of the *Mittry* contract provided:

As the work progresses, partial payments will be made at the end of each calendar month, or as soon thereafter as practicable.

In making such partial payments there shall be retained ten per cent on the estimated amount until final completion and acceptance of all work covered by the contract: *Provided, however,* That the contracting officer, at any time after fifty per cent of the work has been completed, if he finds that satisfactory progress is being made, may make any of the remaining partial payments in full: *And provided further,* That on completion and acceptance of each separate building, vessel, public work, or other division of the contract on which the contract price is

stated separately in the contract, payment may be made in full, including retained percentages thereon, less authorized deductions.

All material and work covered by partial payments made shall thereupon become the sole property of the Government, but this provision shall not be construed as relieving the contractor from the sole responsibility for the care and protection of materials and work upon which payments have been made, nor as a waiver of the right of the Government to require the fulfillment of all of the terms of this contract.[17]

Construing this provision, the court in *Mittry* held that the contractor's right to retain progress payments was based on compliance with the contract terms.

While Article XXIII provides that all material and work covered by partial payments made shall thereupon become the sole property of the Government, it is specifically stated that such provision "shall not be construed as relieving the contractor from sole responsibility for the care and protection of materials and work upon which payments have been made, *nor as a waiver of the right of the Government, to require the fulfillment of all the terms of the contract.*" In view of this explicit language limiting the construction to be placed on the provision for partial payments, the installment payments made on building No. 6 prior to the explosion are not to be treated as payments for parts of such building, but as partial payments advanced on account of a building plaintiffs had contracted to build and deliver to the Government in a "complete and perfect state." The plaintiffs' right to retain such installment payments was conditioned on their subsequent fulfillment of the contract.[18]

Progress payments due after notice of intent to withhold has been served on the contractor may be withheld as a source of leverage to assure the contractor's compli-

---

16. *Mittry v. United States,* 73 Ct.Cl. 341, 360 (1931); *McGowan v. United States,* 35 Ct.Cl. 606 (1900).

17. 73 Ct.Cl. at 344–345.

18. 73 Ct.Cl. at 360–361 (emphasis added).

ance with the terms of the contract. Payments due for services performed before notice has been served may not be withheld, although they may be recoverable in whole or in part as damages for breach of the contract.

 The right to withhold progress payments is limited to circumstances which clearly warrant it.[19] Professor Corbin has well explained the rationale behind such a limitation.

There is a special factor to be considered in the case of a building contract, or any other contract the financing of which requires a progressive expenditure in the course of performance. In these cases, one reason for providing for instalment payments as construction proceeds is to supply the funds necessary for the agreed performance; and failure to pay one or more instalments is more likely to cause inconvenience and difficulty to the building contractor. Therefore, a failure to make one of the progress payments, even though the contract is not divisible into pairs of separate equivalents and the instalment unpaid is only a small part of the whole consideration, is more likely to justify suspension of performance by the builder, or even the total renunciation of further duty.

\* \* \* \* \* \*

Just as in the case of a sale of goods, a building contract is a credit transaction. The builder is risking his labor and materials on the promise of the other party to pay an agreed price therefor in specified instalments. The amount of his investment, the extent of the credit that must be given, and the amount of risk involved are all increased if performance must go on after a payment has failed.[20]

In *United States v. Heyward-Robinson Co.*, 430 F.2d 1077 (2nd Cir. 1970), Heyward-Robinson, the prime contractor, claimed that it was entitled to withhold progress payments due the subcontractor as protection against possible claims by the subcontractor's suppliers. The trial judge had charged the jury that the withholding was proper

. . . if and only if you find three things: first, that Heyward-Robinson knew of the amounts due to D'Agostino's suppliers; secondly, that Heyward-Robinson reasonably notified D'Agostino or that D'Agostino knew of Heyward-Robinson's intent to withhold payment of this amount; and, thirdly, that Heyward-Robinson actually withheld payments of this amount for the purpose of protecting itself from liability from the Plaintiff's suppliers and not for some other reason.[21]

The appellate court found this charge to be a

. . . substantially correct statement of the circumstances under which Heyward had the right to withhold progress payments to protect itself against liability to D'Agostino's suppliers under the terms of the subcontracts in suit.[22]

In the instant case the State withheld Progress Payment #4 in order to (a) protect itself against claims by laborers and materialmen arising from an unbonded contract, and (b) to induce Arctic to obtain bonding as it had contractually obligated itself to do. Under the majority rule, a public body which fails to obtain bonds as required by law is not thereby liable to materialmen and laborers.[23] This issue has not been ruled upon in Alaska, and we do not pass upon it at this time. It would appear, however, that the first reason advanced by the State for the withholding is not a circumstance which clearly warrants the withholding.[24]

---

19. *See* 3A Corbin, Contracts § 692 (1960).

20. 3A Corbin, Contracts § 692, at 269–271 (1960).

21. 430 F.2d at 1086.

22. *Id.*

23. *See* Annot., 64 ALR 678 (1929).

24. *See* 3A Corbin, Contracts § 692 (1960). *Cf. Scaduto v. Orlando*, 340 F.2d 293, 300 (2d Cir. 1965), *cert. denied*, 380 U.S. 978, 85 S.Ct. 1341, 14 L.Ed.2d 272.

The second reason advanced by the State does arguably warrant the withholding. We must balance the policy behind limiting the right to withhold payments against the policy behind requiring payment and performance bonds on public contracts.

A performance bond protects the State from losses and expenses connected with non-performance of a contract. A payment bond serves

> . . . to protect persons who furnish labor or material for a state public works project from the risks of non-payment. In exchange for providing such protection, the state is assured that material and labor will be readily furnished for its projects. Persons who furnish labor and materials for the state's projects do so in reliance on the existence of a valid payment bond.[25]

While the State can withhold progress payments, it must give the contractor notice that payments will not be made until the required compliance is completed. In this case Progress Payments #2 and #3 were made after the bond defect was discovered. The September 10th letter from the Highway Department and the October 3rd letter from the Attorney General only notified Arctic of the bond defect and of the State's view that the defect was grounds for termination of the contract. Nothing was said about withholding progress payments, even though the State knew that work was progressing and that Arctic was continuing to incur debts which it expected to cover with the progress payments. Under the circumstances withholding the progress payment without notice was improper, and it constituted a breach of the contractual agreement between Arctic and the State of Alaska.

Since we have found that the State breached the contract by withholding Progress Payment #4 without proper notice to Arctic, we must remand this case to the trial court for a determination of damages. However, we take this opportunity to furnish some guidelines for the trial court in carrying out this admittedly complicated task.

■ In awarding damages for breach of contract, an effort should be made to put the injured party in as good a position as he would have been in had the contract been fully performed.[26] However, we reiterate once again the principle set forth in the English case of *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng.Rep. 145 (1854):

> Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i. e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach.[27]

The *Hadley* rule is also recognized in the Restatement of Contracts, which provides:

> In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury.[28]

**25.** *State v. Neal and Sons, Inc.,* 489 P.2d 1016, 1020 (Alaska 1971).

**26.** *McBain v. Pratt,* 514 P.2d 823 (Alaska 1973).

**27.** Quoted from 5 Corbin, Contracts § 1007, at 70 n.1.5 (1964).

**28.** Restatement of Contracts § 330 (1932). *See also Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 543, 23 S.Ct. 754, 755, 47

L.Ed. 1171 (1903), in which Justice Holmes announced the principle that:
> [w]hen a man makes a contract, he incurs, by force of the law, a liability to damages, unless a certain promised event comes to pass. But, unlike the case of torts, as the contract is by mutual consent, the parties themselves, expressly or by implication, fix the rule by which the damages are to be measured. . . The extent of liability . . . should be

We note that mere knowledge of a possible harm is not sufficient to impose liability for that harm on the breaching party. Rather, it must be shown that the defendant "had reason to foresee as a probable result of his breach" the damages claimed.

We believe that the *Hadley* rule is a sound one. As we noted in *Skagway City School Board v. Davis*, 543 P.2d 218, 227 (Alaska 1975):

> The *Hadley* rule has the advantage of making those damages highly predictable, and at the same time limited in amount. The endurance of the rule can be explained in part in terms of economic utility. It is thought that by rendering contract damages more readily predictable, persons are encouraged to enter into various transactions with less apprehension than would be true if damages for breach of contract were allowed for relatively remote forms of injury.[29]

Arctic argues that its inability to perform according to the terms of the contract in 1964 was in fact the result of the State's breach in 1962. We find insufficient evidence in the record to make a determination of this question. Therefore, we remand this case to the trial court to take evidence on the issue of whether the damages claimed by the appellant are the necessary and natural consequence of the State's 1962 breach.

However, before turning from the problem of damages, we repeat Professor Corbin's warning about the sensitive fiscal balance of most construction projects.

> [T]he financing . . . requires a progressive expenditure in the course of performance. In these cases, one reason for providing for instalment payments as construction proceeds is to supply the funds necessary for the agreed performance . . . . Therefore, a failure to make one of the progress payments . . is more likely to justify suspension of performance by the builder, or even the total renunciation of further duty. There are many cases holding that nonpayment has justified such a suspension or renunciation.[30]

## CROSS–APPEAL

In its cross-appeal the State alleges that several procedural errors were committed during the processing of this claim. These will be discussed in turn.

1. Did Arctic Contractors have to raise all of its counterclaims herein before the Contract Claims Review Board?

While parties to a contract can bind themselves to a nonjudicial manner of resolving disputes,[31] the question presented here is whether one party is bound by the contractual remedy when the other files a lawsuit. The answer is no. The party sued can waive the provision for nonjudicial dispute resolution and elect to try the issues he wishes to raise in the forum selected by his opponent.[32] Thus, when the State filed the suit for breach of contract herein, Arctic's counterclaim for damages which arose from the same transaction was properly filed.

2. Did the trial court improperly consider issues in Arctic's counterclaims which were not raised before the Contract Claims Review Board?

The State's argument on this point is merely a continuation of its preceding

worked out on terms which it fairly may be presumed [the defendant] would have assented to if they had been presented to his mind.

29. As we did in *Skagway*, 543 P.2d at 227, n.17, we note here that Danzig, "Hadley v. Baxendale: A Study in the Industrialization of the Law," 4 J. Legal Studies 249 (1975), provides valuable insight into the origin of the *Hadley* rule and its function in the modern world.

30. 3A Corbin, Contracts § 692, at 269 (1960) (footnote omitted).

31. *United States v. Moorman*, 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256 (1950). See AS 09.43.-010 *et seq.*, Alaska's version of the Uniform Arbitration Act. Public policy in Alaska favors arbitration as a means of resolving disputes without court interference. *University of Alaska v. Modern Constr., Inc.*, 522 P.2d 1132, 1139 (Alaska 1974); *Nizinski v. Golden Valley Elec. Ass'n*, 509 P.2d 280, 283 (Alaska 1973).

32. *Cf. Radiator Specialty Co. v. Cannon Mills*, 97 F.2d 318 (4th Cir. 1938); Annot., 117 A.L.R. 301 (1938); Annot., 161 A.L.R. 1426 (1946).

contention that the contract limits the parties to one avenue of dispute resolution. The State argues that since Arctic never raised any issues concerning the Thorgaard Pit while before the Board, the trial court could not consider arguments on this point. We find, however, that the State waived this issue by filing suit for breach of contract. When the State chose the superior court as the forum to resolve its dispute with Arctic, it thereby lost any basis it might have had to object when Arctic followed its lead and sought to resolve the issues herein in court.

3. Were the trial court's findings against the State on the Thorgaard Pit issue clearly erroneous?

The Thorgaard Pit was listed in the Farmers Loop contract as an approved source of borrow material, but conflicting results from tests of the quality of the borrow caused delay in approval of its use on the project. The State contends that the trial court confused rejection of a source of borrow material with rejection of the material from a source. The State maintains that it approved Thorgaard Pit as a source of acceptable material, but that Arctic did not extract the acceptable material from the pit.

The State argues that under the terms of the contract its responsibility was to approve pit and quarry sources of borrow. The State maintains that the contract put the responsibility for the quality and quantity of borrow extracted from an approved pit on Arctic. The State's argument is that the rejection of the borrow from the Thorgaard Pit in June, 1962, was not a rejection of the pit as a source. The test results at that time showed that the pit contained acceptable as well as unacceptable borrow. Arctic misunderstood the State's rejection of the borrow to be a rejection of the pit. The test conducted in mid-August, 1962, merely confirmed that the Thorgaard Pit was an acceptable source of borrow. Arctic was not precluded from using the Thor-

gaard Pit when the June test results disclosed that the test borrow was unacceptable. Thus, since Arctic failed to extract the acceptable borrow, the confusion was Arctic's fault.

Arctic's argument is that the trial judge was correct in finding the State responsible for the confusion over borrow material. Arctic argues that the responsibility for approving the borrow was on the State and contends that the confusion over the use of the Thorgaard Pit arose because the State initially approved the pit, then rejected it in June, 1962, and then approved it in mid-August. Arctic maintains that this caused the 32-day delay in prosecuting the work.

▇▇▇ The issue presented is whether the evidence supports the trial judge's findings of fact. The trial judge's findings of fact must be clearly erroneous before they will be set aside by this court. "A finding is not clearly erroneous unless from a review of the entire record we are left with a 'definite and firm conviction that a mistake has been made.' " [33]

The trial judge construed the contract to require the State to make determinations as to the acceptability of borrow materials. On the basis of this construction, and relying on the pre-construction conference and the conflicting test results, the trial judge held that the State caused the confusion over use of the Thorgaard Pit.

There were three tests on the borrow in the Thorgaard Pit. The results of the first test on June 6, 1960, nearly two years before the contract was let, showed:

Investigated materials are suitable for fill material and should, with further development, prove suitable for use as base course.

This preliminary investigation of the proposed borrow pit shows the area to be apparently suitable for development, in respect to accessibility and materials available.

---

**33.** *State v. Phillips,* 470 P.2d 266, 268 (Alaska 1970), quoting *Steward v. City of Anchorage,* 391 P.2d 730, 731 (Alaska 1964).

On June 4, 1962, Arctic was awarded the contract. A preconstruction conference was held on June 12, 1962. The State's District Engineer, District Construction Engineer and Project Engineer, and a representative of Arctic Contractors attended the conference. The minutes of the conference reflect that the following discussion took place:

Mr. Wagner [District Construction Engineer]: Where are your pits?

Mr. Selid [for Arctic]: Birch Hill and Kirney pit above Fowler's. We have a little more negotiating on the Fowler pit.

Mr. Wagner: The Project Engineer will have to get samples from these pits to see if it meets specs—get together with the Project Engineer on this.

Mr. Johansen [District Engineer]: I think we should explain about the Case II borrow. This contract is set up under Case II: By that, we mean we don't care where you get the borrow, but we are going to be absolutely certain it meets the required specifications. If you pick a pit and we don't like it (by that I mean it doesn't meet the specifications), you must find your own pit: We won't tell you which one.

In mid-June, 1962, tests were conducted on the borrow in the Thorgaard Pit. Mr. Raymond Shumway, a civil engineer for the Alaska Department of Highways, was asked at the trial about the results of those tests:

Mr. Wickwire [counsel for the State]: And without reading from them, do some of them recommend that the material be used and some of them recommend it not be used?

Mr. Shumway: Yes, most of them recommend not using as embankment; however some of the samples have indicated that if these samples are representative of the material which is in place, then they would be acceptable.

Another statement of the results of those tests appears in a letter written by Selid for Arctic on August 6, 1962, and sent to Mr. Johansen of the Department of Highways:

Received your letter of August 1st in regards to our project on subject job. Reason for delay is Case 2 Barrow [sic] material time of approximately 32 working days was spent in exploring, prospecting for Case 2 material, which started 13th day of June together with Project Engineer, Mr. Workman Isberg, and Mr. Shumway, Engineer of Tests.

Samples were taken from the Birch Hill-Wainwright, Birch Hill-city pit, Hamilton Acres pit, and Thorgart [sic] Pit. We received the reports on the material the 27th day of June & found this material unsatisfactory & would not comply with spec. for this project, causing us a 15 day delay. We then made an intensive search for material prospecting, opening, & developing pits, building roads & pile driven bridge on 2-shift operation, that also had to be abandoned.

We have at this date August 6, started our case 2 Barrow [sic] material from Goldstream areas with approved material & later will start from the Fox Area consisting of dredge tailings that have been approved for this project.

The revised schedule will be from August 6th to October 1st, for 62 season and 63 season, May 20th to August 1st. . . .

▮ These test results indicate that the State consistently maintained that the Thorgaard Pit was an acceptable source of borrow material. What led Arctic to believe that the entire pit was unsatisfactory is unclear. The finding of the trial judge that the test results of June 27, 1962, indicated that "the borrow located in the Thorgaard Pit was unacceptable" is unsupported by the evidence. We find that finding to be clearly erroneous, and therefore, we reverse the trial court decision on the Thorgaard Pit issue.[34]

34. This case involves a suit and counterclaim for damages on a contract. Neither party plead negligence or negligent breach of contract, yet the dominant theme in awarding and denying damages was the court's findings of negligence. The court awarded to Arctic the $6,400 which the State had withheld in 1962 as damages for the 32-day delay on grounds that

4. Did the trial court err in refusing to award the State liquidated damages for the delay in completion of the Farmers Loop project?

The State contends that it should be allowed to collect liquidated damages for delay in completion of the project as well as actual damages for the cost of completing the road after Arctic had been taken off the project. The trial court denied the State's claim for liquidated damages, and the State appeals this decision.

The liquidated damages clause in the contract herein reads:

. . . the party of the first part [i. e., the State of Alaska] shall have the right to deduct from any monies due or which may become due the Contractor, or if no monies shall be due, the party of the first part shall have the right to recover TWO HUNDRED DOLLARS ($200.00) per day for each and every WORKING day elapsing between the time stipulated for the completion and the actual date of completion in accordance with the terms thereof; said deduction to be made, or said sum to be recovered not as a penalty, but as liquidated damages. Provided, however that upon receipt of written notice from the Contractor of the existance [sic] of causes over which said Contractor has no control and which must delay the completion of said work, the Commissioner of Public Works or the Division Director may, at his discretion, extend the period hereinbefore specified for the completion of the said work, and in such case the Contractor shall become liable for said liquidated damages for delays commencing from the date on which said extended period shall expire.

The contract's General Provision 5, governing contract termination, stipulated:

(a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete such work within such time, the Contracting Officer may, by written notice to the Contractor terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Contracting Officer may take over the work and prosecute the same to completion, by contract or otherwise, *the Contractor and his sureties shall be liable to the State for any excess cost occasioned the State thereby, and for liquidated damages for delay,* as fixed in the specifications or accompanying papers, until such reasonable time as may be required for the final completion of the work, or if liquidated damages are not so fixed, any actual damages occasioned by such delay. If the Contractor's right to proceed is so terminated, the Contracting Officer may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor.

(b) If the Contracting Officer does not terminate the right of the Contractor to proceed, as provided in paragraph (a) hereof, the Contractor shall continue the

---

the "State's negligence was . . . a contributing factor" to the delay. In addition, the court awarded $15,000 to Arctic for damages from the "State's negligent act," i. e., its "erroneous rejection of the borrow in the Thorgaard Pit." Finally, the "negligence of the State" was a reason behind the court's denial of the State's claim for liquidated damages. Memorandum Decision and Order of June 30, 1975.

We think it is important to note that even if the trial judge's finding on the Thorgaard Pit issue had not been clearly erroneous, his award of damages on a negligence theory would have been reversible error.

In *Skagway City School Board v. Davis,* 543 P.2d 218 (Alaska 1975), an action for breach of an employment contract, recovery for injury to Davis' reputation caused by the breach of contract was denied. We stated that "recovery in this case could not be based upon a theory of tort liability." 543 P.2d at 225. Such an award would be unduly speculative and not within the contemplation of the parties at the time they entered into the contract.

As discussed earlier in the opinion herein, contract damages are based on the rule set out in *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng.Rep. 145 (1854). Only foreseeable and certain damages are recoverable. Restatement of Contracts §§ 330, 331 (1932).

work, in which event he and his sureties shall be liable to the State, in the amount set forth in the specifications or accompanying papers, for *fixed, agreed, and liquidated damages for each day of delay* until the work is completed or accepted, or if liquidated damages are not so fixed, for .any actual damages occasioned by such delay. (Emphasis added)

In *Merl F. Thomas Sons, Inc. v. State,* 396 P.2d 76, 79 (Alaska 1964), we discussed the criteria for determining whether a liquidated damages clause is enforceable. In that case we adopt the position of the *Restatement of Contracts,* which provides:

(1) An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless

(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.[35]

■ We note further that there is no legal objection to stating liquidated damages in terms of a per diem percentage of the contract price or in terms of a stated sum per day,[36] as was done in this case. We recognize the widespread use of liquidated damages clauses in the construction contracts field and join the vast majority of authorities in approving its use as a tool helpful for meeting the particular needs of this field.[37] The liquidated damages clause in the contract before us does not appear to impose a penalty because the amount fixed as damages appears to represent a reasonable forecast of just compensation for the harm which would be caused by a delay and because the harm which would be caused by a delay appears difficult to accurately estimate.

In the case at bar, the State exercised its right to terminate the contract and to let the unfinished portion of the project to a new contractor. Thereafter the State sought to collect actual damages incurred as a result of additional costs, as well as liquidated damages until the date of completion.

■ We begin by noting the general rule set forth in *Manart Textile Co. v. United States,* 77 F.Supp. 924, 925 (Ct.Cl.1948):

It has been repeatedly held in construing standard construction contracts that when the defendant exercises the privilege of cancellation it may let the unfinished portion to a new contractor and collect the excess costs, but it may not also collect liquidated damages; in other words, that it has the choice of permitting the plaintiff to finish and collecting liquidating damages, or letting the contract elsewhere and collecting excess costs, but that it cannot do both. *United States v. American Surety Co.,* 322 U.S. 96, 100, 64 S.Ct. 866, 88 L.Ed. 1158; *United States v. Cunningham,* 75 U.S.App. D.C. 95, 125 F.2d 28; *Maryland Casualty Co. v. United States,* 93 Ct.Cl. 247; *Fidelity & Casualty Co. of New York v. United States,* 81 Ct.Cl. 495.

A close reading of the cases cited in *Manart Textile Co.* reveals that the decisions in those cases were based on construction of the contracts involved.

Most of the cases cited in *Manart Textiles Co.* involved contracts with terms identical or similar to the one found in *United States v. American Surety Co.,* 322 U.S. 96, 64 S.Ct. 866, 88 L.Ed. 1158 (1943). The *American Surety* contract term read in pertinent part:

*Delays—Damages.*—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in Article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the con-

**35.** Restatement of Contracts § 339(1) (1932).

**36.** *Phoenix Iron Co. v. United States,* 39 Ct.Cl. 526 (1904).

**37.** 5 Corbin, Contracts § 1068 (1964).

tractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event, the Government may take over the work and prosecute the same to completion by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor's right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event the actual damages for the delay will be impossible to determine and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay, until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof. . . .[38]

We believe that the proper interpretation of such a contract provision is that voiced by the court in *Fidelity & Casualty Co. of New York v. United States*, 81 Ct.Cl. 495, 502 (1935):

The defendant elected to choose the first of these alternatives and when that decision was made the second alternative disappeared from the picture. It was thereafter mere surplusage. Upon the termination of the contract no liquidated damages could be charged to or be recoverable from the contractor.

This interpretation has received wide support. Professor Corbin has suggested that [w]here a public construction contract provided for termination by the government for breach by the contractor, a provision for $25 per day as liquidated damages for delay was interpreted as not applicable after such a termination by the government. Such a rule seems to be a reasonable one even where there is no such express limitation.[39]

However, the facts of this case do not fall within this general rule of contract construction. The contract terms do not expressly provide for such a result nor do they fail to speak on this question. Rather the terms here quite specifically direct a result contrary to the general rule. The contract states that:

the Contractor and his sureties shall be liable to the State for any excess cost occasioned the State thereby, *and* for liquidated damages for delay. . . . (Emphasis added)

The parties to this contract expressly stipulated to a damage provision other than the general rule that liquidated damages and actual damages are not recoverable for the same contract breach.

In *Day v. A & G Construction Co., Inc.*, 528 P.2d 440, 444–445 (Alaska 1974), we announced the test for determining the intention of parties who have entered commercial contracts:

"Expectation" or "understanding" standards allow substantially more leeway since a reasonable man is placed in the position of the parties, and the question is what he would reasonably expect that language to mean under the circumstances. Both Williston and the Restatement adopt the standard which ascertains intention through "reasonable expectation." We hold the appropriate standard to apply here is that of the reasonable expectation of the parties, i. e. "the sense in which the party using the words should reasonably have apprehended that they would be understood by the other party", and the meaning which the recipient of the communication might reasonably have given to it. (footnotes omitted)

A reading of the contract term herein shows that it is subject to only one reasonable interpretation. In the event of a proper exercise of the right of termination by the

**38.** 322 U.S. at 98, n. 3, 64 S.Ct. at 868.

**39.** 5 Corbin, Contracts § 1072, at 409 (1964) (footnote omitted).

State, the contractor became liable under the terms of the contract for both actual and liquidated damages.

■ However, while we note once more "the basic tenet that competent parties are free to make contracts and that they should be bound by their agreements,"[40] we cannot for policy reasons permit enforcement of the double damage provision provided by the parties to the contract in this case. In reaching this result, we rely on the rationale behind the *Restatement* test for a valid liquidated damages clause. A valid liquidated damages clause is an agreement to set in advance damages for breach which would otherwise be difficult to determine. However, the clause may not set damages so as to penalize the breaching party for the breach, without regard to the harm caused by the breach.[41] Thus, even though the contract in this case permits imposition of liquidated damages for delay as well as excess costs incurred by termination of the contract and reletting thereof, the liquidated damages clause, which standing alone appears valid, is invalid because it operates as a penalty when viewed in conjunction with the provision for actual damages.

For the above stated reasons, the holding of the trial court that liquidated damages are not available to the State is affirmed.

**5. Could Arctic, a dissolved corporation, obtain affirmative relief?**

AS 10.05.594[42] specifically provides that dissolution of a corporation does not impair any remedy available to a corporation for a claim existing prior to dissolution if an action is commenced within two years after dissolution. The complaint in this case was filed in 1965. Arctic was not dissolved until 1968. Thus, if the State was asserting on appeal only that Arctic was without capacity because it had been dissolved, AS 10.05.594 would control disposition of the capacity issue.

However, the State asserts further that Arctic was disabled from seeking affirmative relief by AS 10.05.720.[43] That section provides that a corporation may not commence or maintain a court proceeding without alleging and proving that it has paid its annual corporation tax last due and has filed its annual report last due. The State argues that since Arctic ceased paying taxes and filing annual reports in 1966, the trial court erred in refusing to dismiss Arctic's counterclaims.

■ We have previously held that AS 10.05.720 is designed to bar only commencement or maintenance of suits by corporations which fail to pay corporation taxes or

**40.** Inman v. Clyde Hall Drilling Co., 369 P.2d 498, 500 (Alaska 1962).

**41.** Comment a to the Restatement of Contracts § 339(1) (1932) notes:
Punishment of a promisor for breach, without regard to the extent of the harm that he has caused, is an unjust and unnecessary remedy. Therefore, the power of parties to make an enforceable contract for the determination of damages in advance is limited as stated in this Section.

**42.** AS 10.05.594 provides:
The dissolution of a corporation either by (1) the issuance of a certificate of dissolution by the commissioner, or (2) a decree of the court when the court has not liquidated the assets and business of the corporation as provided in this chapter, or (3) by expiration of its period of duration, does not take away or impair a remedy available to or against the corporation, its directors, officers, or shareholders, for a right or claim existing, or a liability incurred, prior to dissolution if an action or other proceeding is commenced within two years after the date of dissolution. The action or proceeding by or against the corporation may be prosecuted or defendant by the corporation in its corporate name. The shareholders, directors, and officers may take appropriate action to protect the remedy, right, or claim. If the corporation was dissolved by the expiration of its period of duration, it may amend its articles of incorporation at any time during the two-year period in order to extend its period of duration.

**43.** AS 10.05.720 provides in pertinent part:
No domestic or foreign corporation may commence or maintain a suit, action or proceeding in a court in the state without alleging and proving that it has paid its annual corporation tax last due and has filed its annual report for the last calendar or fiscal year for which the report became due.

fail to file annual reports.[44] If capacity to sue is denied to a corporation on that ground, the corporation is still allowed to prove any counterclaim it may have as a setoff to any claim filed against it. However, a court cannot render an affirmative judgment in favor of the corporation.[45]

The trial court did not err in refusing to dismiss Arctic's counterclaims against the State because those claims could have resulted in a setoff against the State's claim. We do find that even if the trial court ruling on the Thorgaard Pit issue had been correct, it committed error by entering an affirmative judgment in favor of Arctic.

## CONCLUSION

In order to make the trial court's task on remand somewhat easier, we now summarize the conclusions we have reached in this case. The State of Alaska has the duty to investigate the validity of payment and performance bonds on state construction projects. Construction contractors have a continuing obligation to provide the required bonds even if the State does not discover defects in the bonds until after their acceptance.

Under the contract herein, the State could have withheld progress payments for services furnished after notice of intent to withhold was given in order to force Arctic to obtain new bonds. The withholding of Progress Payment # 4 without notice to Arctic constituted a breach of the contract. We remand this case to the trial court for a determination of whether Arctic's inability to perform the contract was a foreseeable result of the State's improper withholding of the progress payment in 1962.[46]

As for the cross-appeal, we have concluded that Arctic had capacity to raise the counterclaims herein but was not entitled to any affirmative judgment in its favor. The trial court did not err in considering issues in Arctic's counterclaims which were not raised before the Contract Claims Review Board.

The trial court decision against the State on the Thorgaard Pit issue was clearly erroneous, and we reverse it. The State did not breach the contract in its conduct of the Thorgaard Pit tests. Therefore, the award of damages to Arctic based on the confusion over the Thorgaard Pit was improper for this reason as well as because Arctic was without capacity to obtain an affirmative judgment.

Under the contract herein, if the trial court determines that Arctic's inability to perform the contract was not a foreseeable consequence of the State's improper withholding of the 1962 payment, the State is entitled to actual damages for the cost of completing the project after Arctic was terminated, but not to liquidated damages for the delay in completion of the project. If the trial court determines that Arctic's inability to perform was a foreseeable consequence of the State's breach, the State is not entitled to damages for the increase in the cost of completion.[47]

---

**44.** *Alaska Mines and Minerals, Inc. v. Alaska Industrial Bd.,* 354 P.2d 376, 379 (Alaska 1960).

**45.** *Kupka v. Morey,* 541 P.2d 740, 752, n. 30 (Alaska 1975).

**46.** It appears that the trial judge did attempt to make a finding on the issue of foreseeability. That finding is confused by his reliance on a tort theory of liability. See n. 34, *supra.* It also is not precisely the finding which this opinion requires.

The trial court found that "the State certainly could not have foreseen the chain of events which allegedly lead [sic] to the financial demise of Arctic Contractors." Memorandum Decision and Order of June 30, 1975. However, the court was attempting to assess the reasonably foreseeable consequences of the State's "negligence" in rejecting the Thorgaard Pit borrow. The remand mandated by our opinion here is to determine what damages were reasonably foreseeable as a result of the State's improper withholding of Progress Payment # 4.

**47.** Although we recognize that the trial judge may have delayed decision of this case for longer than would ordinarily have been acceptable, the case is an extraordinarily complicated one and we wish to compliment the trial judge for his valiant attempt to sort out this case. We realize how difficult it is to reconstruct such a complex factual setting so long after the events occurred. We are further aware that the remand in this case will unfortunately require another such reconstruction.

REVERSED and REMANDED for further proceedings in conformity with this opinion.

BOOCHEVER, Chief Justice, dissenting in part.

I dissent from the portion of the opinion which holds that the state cannot recover both the additional costs of completing the contract and liquidated damages for delay. The majority opinion concludes that "in the event of a proper exercise of the right of termination by the State, the contractor becomes liable under the terms of the contract for both actual and liquidated damages." I agree with the majority that this is the only reasonable interpretation of the contract language. I do not find, however, that provision for both liquidated damages and the additional costs of completing the contract results in double recovery and makes the terms of the contract invalid for policy reasons.

The liquidated damages are included to compensate the state for delays in completing the contract. Since these damages would be very difficult to compute, the use of a reasonable sum as liquidated damages is permissible. The cost of delay, however, is distinct from actual costs incurred by reason of the state having to complete the contract, as the following example illustrates.

If a contractor refuses or fails to prosecute the work so that the state is required to complete the contract, the state is entitled to any additional costs of completion.[1] Such costs would be incurred if the original contractor had underbid the contract. Moreover, if by the time that the state took over the work, it was so far behind schedule that completion within the specified time was impossible, the state would also be enti-

tled to damages for delay. If, however, the work had been on schedule and could be completed within the specified time, the damages would be limited to the difference between the cost of completion and the contract price. The liquidated damages provision under such conditions would not be applicable because there was no delay.

I see no policy considerations that should prohibit parties from agreeing to compensation for both items of damages when facts indicate that separate damages have been suffered in completing the contract and by reason of delay.

1. The contract specifies:
 If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete such work within such time, the Contracting Officer may, by written notice to the Contractor terminate his right to proceed with

the work or such part of the work as to which there has been delay. In such event the Contracting Officer may take over the work and prosecute the same to completion, by contract or otherwise, *the Contractor and his sureties shall be liable to the State for any excess cost occasioned the State thereby,* . . . (emphasis added)