**T. FERGUSON CONSTRUCTION, INC., Appellant,**

v.

**SEALASKA CORPORATION, Appellee.**

No. S–3648.

Supreme Court of Alaska.

Nov. 15, 1991.

Clifford H. Smith, Mary E. Guss, Law Offices of Clifford H. Smith, Ketchikan, for appellant.

Patrick B. Gilmore, Atkinson, Conway & Gagnon, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This is an appeal from a decision of the superior court after a bench trial. The court determined that Sealaska Corporation was justified in withholding a progress payment due to T. Ferguson Construction Company under two related construction contracts and awarded damages to Sealaska. Ferguson appeals. We affirm.

I

The facts of this case are largely undisputed. In late April 1988, T. Ferguson Construction, Inc. (Ferguson) entered into three road construction contracts with Sealaska Corporation. The contracts involved construction and rehabilitation of logging

roads at Tolstoi Bay, Copper Mountain, and Cabin Creek, three sites on Sealaska land located on the west side of Prince of Wales Island. In addition to the roads, the Tolstoi and Cabin Creek contracts called for construction of "sort yards," which are used for the stacking and storage of cut timber. The contracts emphasized that time was of the essence and established a completion date of September 15, with a default date of September 25.

Because Sealaska did not have the permits required to begin the work at Tolstoi, it directed Ferguson to begin with the Copper Mountain and Cabin Creek projects first. The jobs almost immediately fell behind schedule, largely because Ferguson had inadequate equipment for the projects and inadequate financial resources to mobilize for the operation. A dispute also arose as to whether Sealaska was required to pay per unit of road completed[1] or based on Ferguson's bid schedule.[2] Despite the dispute, Sealaska consistently made "measure-ups" on the twenty-fifth of each month and made payment based on these measure-ups by the tenth of the following month.[3]

In September 1988, the parties entered into an "Agreement for Termination and Modification of Construction Contracts." This agreement, effective September 20, terminated the Tolstoi contract. It also modified the Cabin Creek and Copper Mountain contracts in several ways. First, as held by the superior court, "Ferguson, by necessary implication, acknowledged the correctness of Sealaska's contract interpretation and method of payment."[4] The parties also agreed that through August 25, Ferguson had earned $205,344.42 on the Cabin Creek contract, but had been paid $278,949.65. On the Copper Mountain contract Ferguson had earned $52,992.72, but had been paid $78,530.92. Thus, this new accord reflected both parties' agreement that Sealaska had paid Ferguson $99,143.43 more than it was owed. The agreement specified that $60,000 of that overpayment was an advance made by Sealaska on September 6 to allow Ferguson to buy three dump trucks. The rest of the excess apparently arose from overpayments made by Sealaska intended to alleviate Ferguson's cash flow problems.

The modification established a new completion date of November 15 and default date of November 25. Sealaska also agreed to advance Ferguson another $50,000 in cash. The agreement specified that the $110,000 from the truck loan and the cash advance would be paid in equal installments out of funds due to Ferguson on October 10, November 10, and December 10.[5]

This modification proved to be short-lived. On October 10, Thorne Ferguson, Sr., called Sealaska's project manager, Jack Coady, to inquire whether the September payment had been mailed and how much it was. Coady indicated that the check was in the mail and that the amount was $52,000. There was apparently a dispute over how much was actually due. Although Coady claimed that Mr. Ferguson then told

---

1. Such payment would be based on "measure-ups": Sealaska measured the linear distance of completed road, multiplied that by the contract rate, then deducted for any deficiencies in performance to arrive at a payment figure. The contract rate for both the Cabin Creek and Copper Mountain contracts was about $135,000 per mile.

2. This method would be based on payment for each component of the work, rather than length of road completed.

3. Both contracts specified that "Sealaska shall make best efforts to pay Contractor on the tenth (10th) day of each month. Payment shall be considered late if received after the fifteenth (15th) day of the month."

4. Concerning payments, the agreement said:

   Contractor agrees that the measure-up date for determining the amount of work satisfactorily completed is on or about the 25th day of each month, with payment for satisfactory work completed to be made on or about the 10th day of the following month, as set forth in said contracts.

5. It is not clear what, if any, provision was made concerning the overpayments Sealaska had made. Apparently, the overpayments were for work completed by Ferguson but not yet compensable under Sealaska's measure-up procedure. Thus, they may have been taken into account in calculating amounts owed after subsequent measure-ups.

him that Ferguson could not or would not continue performing, the court found that Mr. Ferguson did not make any such statement.

The next day Coady and Sealaska's chief engineer, Andy Mendenhall, flew over the work sites to see if work was continuing; they observed virtually no activity at either location. As it turned out, the check had not been mailed out due to the Columbus Day holiday. Sealaska decided on the evening of October 11 to withhold the check and so informed Mr. Ferguson. No work was done on either project after October 11. The issue at trial was whether Sealaska breached its contracts with Ferguson by withholding the payment or whether such withholding was justified.

A bench trial was held in Juneau in July 1989. In a Memorandum Decision issued August 15, 1989, the superior court found in favor of Sealaska and assessed damages at $57,449.70 plus interest, costs, and fees.[6] Although the court found that Mr. Ferguson had not told Coady his company was ceasing performance, it did find that withholding the payment was justified based on a number of facts known to Sealaska at the time:

> Sealaska knew that the equipment Ferguson had available was too light for the work, that there was not enough of it, that most of the equipment available at either site was not operable and that very little progress had been made during the last pay period so that the work remained behind even the new schedule. That Ferguson lacked the necessary resources was not the fault of Sealaska. Sealaska had already advanced substantial funds to Ferguson over and above what Ferguson had earned. Sealaska was under no obligation to advance further funds, particularly when it appeared that even with further advances, Ferguson would probably not be able to meet the new completion date agreed to by the

parties in the termination and modification agreement.

> The court, therefore, concludes that Sealaska did not breach the contract when the October 10, 1988, progress payment was withheld, but that Ferguson was in breach of the contract by failing to perform the work in a timely manner due to a lack of equipment suitable for the work.

The superior court denied Ferguson's motion for reconsideration, and this appeal followed.

## II

Ferguson appeals and argues that the superior court erred as a matter of law in finding that Ferguson, rather than Sealaska, breached the contract.[7] The first part of this discussion thus considers whether Sealaska was justified in withholding payment in light of the factual determinations of the superior court. Although Ferguson is at great pains to characterize the question as one of law, the thrust of its argument is really that the superior court's factual finding that Ferguson could not perform was in error. The second part of this discussion thus considers whether the superior court clearly erred in its factual determination that Ferguson could not perform its obligations.

## A

■ Although Sealaska primarily argued that Mr. Ferguson's repudiation of the contract to Coady justified its withholding of the payment, the superior court found that Mr. Ferguson did not repudiate the contract in that phone conversation. The court went on to hold, however, that "[u]ltimately, it is not necessary to determine the factual issues of who said what as between Mr. Coady and Mr. Ferguson on October 8, 9, and 10, 1988, because the issue is whether Sealaska was justified in withholding the October payment, based on the information then available to it." The court then found

---

6. The sum came from $57,001.98 that Sealaska had paid to Ferguson in excess of the amount earned, plus $447.72 over the contract price required to complete the projects.

7. Our review of questions of law is *de novo.* *Langdon v. Champion,* 745 P.2d 1371, 1372 n. 2 (Alaska 1987).

that Sealaska knew that Ferguson did not have the right equipment to perform its obligations, that Ferguson did not have enough equipment, that most of what equipment Ferguson did have was broken, and that Ferguson's slow progress in the period shortly before Sealaska withheld the payment put the project behind even the new schedule agreed to less than three weeks before. The superior court's factual findings were thus that Ferguson could not finish the job and that Sealaska knew it.

We have held that "[t]he right to withhold progress payments is limited to circumstances which clearly warrant it." *Arctic Contractors, Inc. v. State*, 564 P.2d 30, 43 (Alaska 1977). We cited Professor Corbin's explanation of the rationale of this rule, which concluded:

> [A] building contract is a credit transaction. The builder is risking his labor and materials on the promise of the other party to pay an agreed price therefor in specified instalments. The amount of his investment, the extent of the credit that must be given, and the amount of risk involved are all increased if performance must go on after a payment has failed.

*Id.* (quoting 3A A. Corbin, *Corbin on Contracts* § 692, at 271 (1960)).

As Professor Corbin said just prior to the quoted passage, however, "circumstances alter cases." 3A A. Corbin, *Corbin on Contracts* § 692, at 271 (1960). The circumstances in this case are the inverse of the normal situation. Here, the creditor is the owner rather than the builder. Sealaska risked a substantial amount of cash on the promise of Ferguson to finish the Cop-

per Mountain and Cabin Creek projects in a timely manner. As of its decision to withhold the October payment of $52,000, Sealaska knew (according to the superior court) that Ferguson would not be able to discharge its debt to Sealaska through completion of the project. This circumstance is, therefore, one which clearly warrants withholding the payment, for to make the payment would be to throw good money after bad. *See United States v. Buffalo Coal Mining Co.*, 343 F.2d 561, 565 (9th Cir.1965) ("The law does not require a useless act, particularly where, as here, it would only enhance the actor's loss.").[8]

The Restatement (Second) of Contracts notes that

> [a]n obligee who believes, for whatever reason, that the obligor will not or cannot perform without a breach, is always free to act on that belief.... If he can prove that his belief would have been confirmed, he is at least shielded from liability even if he has failed to give a performance that is due before that of the obligor or has, by making alternative arrangements, done an act that amounts to a repudiation.

Restatement (Second) of Contracts § 251 comment b (1981). The rationale behind this rule is that no plaintiff can collect damages in an action for breach of contract without first showing his own willingness and ability to perform. *Id.* at § 254.[9]

In this case, Sealaska believed that Ferguson would not be able to perform and acted on that belief. Sealaska subsequently proved to the court that its belief was correct.[10] As a matter of law, the superior

---

8. *Cf. Mayer v. Alexander & Baldwin, Inc.*, 56 Hawaii 195, 532 P.2d 1007, 1009 (1975) ("When time is of the essence or a delay has become so serious as to justify discharge of the contractor, an owner may assume control of the work, cause it to be completed, and hold the contractor for his reasonable expenditures if in excess of the unpaid balance of the contract price."); *Prince v. R.C. Tolman Constr. Co.*, 610 P.2d 1267, 1268 (Utah 1980) ("[W]here a subcontractor is failing to perform on a contract, the main contractor may step in and complete what has to be done, and the defaulting party is entitled to receive payment for only that part of the work actually performed.").

9. *See also* 11 S. Williston, *Williston on Contracts* § 1313 (W. Jaeger 3d ed. 1968) ("Every consideration of justice requires that ... inability to perform should immediately excuse the innocent party from performing, or preparing to perform, nor is any technical rule violated if the excuse is allowed.").

10. Ferguson argues very briefly that Sealaska never demanded adequate assurance before it withheld payment. Section 251 of the Restatement (Second) of Contracts concerns the obligee's right to demand adequate assurance and was embraced by this court in *L.E. Spitzer Co. v. Barron*, 581 P.2d 213, 216 (Alaska 1978) (citing 1974 tentative draft of Restatement (Second) of

court was thus correct in finding no breach on Sealaska's part, given the factual holding that Ferguson could not have performed even if payment had been forthcoming. Without challenging the superior court's factual determination that it was incapable of performing or of discharging its sizable debt to Sealaska, Ferguson cannot tenably argue that Sealaska had a duty to give it yet another large infusion of cash.[11]

## B

■■■ This court will not disturb the trial court's factual findings unless those findings are clearly erroneous. *Oaksmith v. Brusich,* 774 P.2d 191, 195 (Alaska 1989). In seeking to avoid this deferential standard of review, Ferguson maintains that it does not disagree with the trial court's findings of fact:

> The appellant agrees with the court's factual determination that "Ferguson did not tell Coady or Loescher that it was abandoning or terminating that contract." It disagrees with the court's conclusion that Sealaska was under no legal obligation to pay any contract sums to Ferguson on October 10. It is the court's legal conclusion which is incorrect. . . .

Contracts). Even assuming the absence of any demand for assurance, Ferguson errs in implying that Section 251 creates a *requirement* for such a demand. Rather, it "affords [the obligee] the *opportunity,* in appropriate cases, to demand assurance of due performance and thereby avoid the uncertainties that would otherwise inhere in acting on his belief." Restatement (Second) of Contracts § 251 comment b (1981) (emphasis added); *cf. Howard S. Lease Constr. Co. v. Holly,* 725 P.2d 712, 716 (Alaska 1986) (contractor entitled to withhold part of progress payment if it feels subcontractor has not substantially performed, but runs risk of guessing wrong as to whether performance was substantial and whether amount withheld was appropriate).

Ferguson complains, also very briefly, that Sealaska did not give the notice of default required by the contracts. To the extent this fact has any bearing on the case, a letter on October 12, 1988, from Sealaska's attorney to Ferguson's attorney seems to meet the requirement. That letter specifically notes Sealaska's observation that work had for all intents and purposes ceased at the construction sites and its discovery

Appellant's Reply Brief at 2. That protestation notwithstanding, its argument is really factual in nature, concerning whether Sealaska possessed the knowledge ascribed to it by the trial judge: "The evidence in the present case is all to the contrary [as to whether Sealaska was justified in withholding payment]." Ferguson likewise contends that the trial judge's finding that it could not perform "flies ... in the face of the evidence at trial."

Although Ferguson does not cite to any evidence in the record that it could perform, it notes that the parties agreed as of September 20, when they signed the modification agreement and Sealaska advanced another $50,000, that Ferguson was in compliance with the contracts. Ferguson argues that nothing occurred between September 20 and mid-October to change that situation. In fact, substantial evidence was presented to the trial judge to allow him to conclude that Sealaska believed Ferguson's ability to perform had deteriorated in the three weeks after the signing of the modification agreement, or at least had not improved to the extent contemplated when Sealaska signed the modification. Our review of the entire record does not reveal any evidence that would engender "a firm

that Ferguson had allowed required letters of credit to lapse. This letter was transmitted three days before the October payment would be considered late. Rather than cure these defaults, or give any indication that they would cure the defaults, Ferguson in fact ceased all activity at the construction sites and sent its employees home.

**11.** The superior court's holding that Ferguson was in breach as of October 10 is technically incorrect, but the error is harmless. Although Ferguson's inadequate performance to that date justified Sealaska's withholding of the payment, Ferguson had until November 25, the termination date of the contract, to cure its failure before it was "in breach." *See* Restatement (Second) of Contracts § 235 comment b (1981) ("Non-performance is not a breach unless performance is due."). In any event, Ferguson ceased work and filed suit on November 21, which amounted to a "definite and unconditional" repudiation of the contract. *See Holiday Inns of America v. Peck,* 520 P.2d 87, 89 n. 3 (Alaska 1974) (quoting 4 A. Corbin, *Corbin on Contracts* § 959 (1951)). At that point, having not performed, Ferguson was in breach.

and definite conviction ... that a mistake has been made." *Martens v. Metzgar*, 591 P.2d 541, 544 (Alaska 1979); Alaska R.Civ.P. 52(a).

The trial court heard evidence that on or about September 25, five days after signing the modification agreement, Sealaska learned that Ferguson's backhoe had broken down and needed to be shipped out for repairs. Without the backhoe, according to Sealaska's chief engineer, "there was going to be a major problem maintaining any production at all with Cabin Creek." Yet, according to the chief engineer, the backhoe still had not been shipped out for repairs by the time operations were halted on October 11.

Although the modification agreement contemplated that Ferguson would acquire three dump trucks with the September 6 loan of $60,000, Sealaska learned subsequently that Ferguson only acquired two trucks, both of which quickly broke down. The result was that "[p]rogress never increased any appreciable amount that was contemplated under the modification agreement. And, in fact, for the rest of the time that Ferguson worked at Cabin Creek, he essentially still had one operable dump truck governing the speed of the operation, which resulted in no improvement in efficiency." The court also heard testimony that by the time the payment would have been late—October 15—Sealaska knew as well that Ferguson's compressor was broken, that its employees had left the job site, and that Ferguson had allowed two $15,000 performance bonds, required by the contract, to lapse.

All of these facts, known to Sealaska, were largely undisputed. Sealaska's project manager testified that in his opinion Ferguson would never have finished the job with the money remaining under the contract. Without denying the problems that arose subsequent to the September 20 agreement, Thorne Ferguson, Sr., testified that he could have finished the job, but it would have been "tight." Ferguson's expert witness also testified that Ferguson could have finished. But, both Ferguson and his expert based their views on changes in the operation that Ferguson was about to make when work was halted.

As the expert testified,

[I]nstead of trying to operate two spreads that were only 70 or 80 percent complete, [Ferguson's] game plan was to consolidate those spreads. So they would have had some spares. He would have more availability and better efficiency. And so this estimate is based upon those improvements in the operation. And, of course, the day of the famous fly over [October 11], he was actually kind of making some progress toward that, because instead of trying to limp along with equipment that didn't work, he was fixing his equipment.

This new game plan came, however, more than five months into a project that Ferguson had originally estimated would take about two months, and almost three weeks after the modification agreement, which only extended the completion date by eight weeks. The superior court thus had ample reason to conclude that Ferguson would not have been able to complete the contract.

AFFIRMED.

MATTHEWS, J., with whom RABINOWITZ, C.J., joins, dissents.

MATTHEWS, Justice, with whom RABINOWITZ, Chief Justice, joins, dissenting.

Under our case law, progress payments can be withheld only when clearly warranted by the circumstances. *Arctic Contractors, Inc. v. State*, 564 P.2d 30, 43 (Alaska 1977). The parties modified their contract on September 20, 1988. A little more than three weeks later Sealaska decided to withhold a payment which it had promised to make under the agreement as modified. The trial court found that this was justified based on the information then available to [Sealaska]. Sealaska knew that the equipment Ferguson had available was too light for the work, that there was not enough of it, that most of the equipment available at either site was not operable and that very little progress had been

made during the last pay period so that the work remained behind even the new schedule.

None of these reasons were the reasons given by Sealaska's decision maker, Loescher, for withholding the payment.[1] Importantly, Loescher indicated that the late September measure-up monitoring Ferguson Construction's progress "seemed to go okay." Withholding of progress payments is justified only if the withholding party actually relies on the circumstances which clearly warrant that action. *United States v. Heyward–Robinson Co.*, 430 F.2d 1077, 1085–86 (2d Cir.1970). (In that case, the appeals court upheld an instruction requiring that the jury find the prime contractor actually relied on the reason which the court found justified withholding payment.). I conclude, therefore, that the findings made by the trial court do not support its conclusion that the withholding of the payment by Sealaska was justified. Accordingly, I would reverse the judgment.

---

**1.** Loescher described three reasons for his decision:

(1) Coady's statement that Ferguson had told him that Ferguson was quitting the job;

(2) Ferguson had let the performance bonds lapse; and

(3) Ferguson would have owed Sealaska more money than was owed to Ferguson had the payment been made.